# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HARRY A. BURNETT, | CASE NO. 05cv0167-LAB (BLM) |
| Plaintiff, | **ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| ERIC HOLDER, Attorney General of the United States, | |
| Defendant. | |

## I.    INTRODUCTION

Plaintiff Harry A. Burnett alleges employment discrimination on the basis of disability and race while he was employed as a forensic chemist with the United States Drug Enforcement Administration (DEA). He moves for partial summary judgment on the issue whether denial of a training opportunity in 1997 constituted disability discrimination. The DEA opposes Burnett's motion and cross-moves to dismiss Burnett's claims, or in the alternative for summary judgment. Burnett opposes the cross-motion. For the reasons which follow, the DEA's motion for summary judgment is **GRANTED**. Burnett's motion for partial summary judgment is **DENIED**.

/ / /

/ / /

/ / /

## II.    FACTS

Burnett, an African-American man, began working for the DEA in 1992 as a forensic chemist, and continues to work there today.  (Doc. No. 30, *Joint Statement of Undisputed Facts* (*JSUF*), ¶¶ 1 & 3.)  Between 1992 and 1996, he received several promotions and rose from a GS-5 employment level to GS-12.  (*Id.* at ¶¶ 4 & 8-9.)  In June 1995, Burnett underwent back surgery which resulted in, among other things, a limitation of his lifting capabilities.  (*Id*. ¶¶ 24-25.)

From October 1995 to July 1998, Burnett was supervised by Claude Roe.  (*Id.* ¶ 6-7.)  Under Roe's supervision Burnett was promoted to a GS-12, and received timely step increases in June 1996, 1997, and 1998.  (*Id.* ¶ 12.)  For his annual performance reviews in 1996, 1997 and 1998, Burnett's overall performance was rated as "excellent," the second highest of five available performance ratings.  (*Id.* ¶ 10-11.)  In July 1997, Roe recommended Burnett for an eight-hour time off award.  (*Id.* ¶ 13.)

Burnett claims Roe discriminated against him starting in 1997 by denying him certain employment opportunities and responsibilities, which would have increased his chance of promotion to the GS-13 level.[1]  (Compl. at ¶ 7.)  Specifically, Burnett complains he was denied job training and opportunity to "sit in" as temporary supervisor in Roe's absence.  (*Id.*)

In October 1997, Burnett submitted a written request to Roe to attend the Clandestine Laboratory Re-certification training.  In his request, Burnett also stated, "Although my present medical restriction eliminates me from participating in clan [clandestine] labs, there is a substantial exchange of information which occurs at these classes which may still be of

---

[1] Burnett admitted that during the period of Roe's supervision, he was not qualified for promotion to GS-13.  As of February 1998, there were three routes for promotion from GS-12 to GS-13:  (1) competitive "supervisory" promotion, (2) non-competitive "impact" promotion, and (3) non-competitive "generalist" promotion.  (Phillips Decl. ¶ 4.)  Before February 1998, only the first two routes were available.  (*Id.*)  Burnett admitted that during the relevant time he did not meet some of the requirements to qualify for promotion to GS-13 under any of the three routes.  (*See* Def.'s Ex. A at 63, 70, 72-74, 241, 292-95; Ex. B at 193-94.)  For example, he had not conducted any original research, he was not recognized in his group as an expert, and was not a member of any professional organization.  (*Id.*)  Furthermore, to qualify for a "generalist" promotion, a person must have served at the GS-12 level for at least three years.  (Phillips Decl. ¶ 7.)

1  some use when answering questions of a technical nature from others." (JSUF ¶ 61; Def.'s
2  Ex. M at 11.)

3       This request came on the heels of a re-evaluation of Burnett's physical condition after
4  his back surgery in 1995.  Although Burnett was initially restricted to "light duty," he was
5  cleared "to resume full duties" on August 3, 1995.  (JSUF ¶¶ 24-27.)  Burnett received his
6  Clanlab Safety Training and Certification in 1995, which permitted him to participate with
7  DEA special agents and other forensic chemists in the seizure and dismantling of
8  clandestine laboratories.  (*Id.* ¶¶ 31-32.)

9       On January 7, 1997, Roe informed Burnett his name would be added to the Clanlab
10  duty roster.  (*Id.* ¶ 34.)  Burnett refused this, responding by pointing to a June 13, 1995
11  memo from his doctor, restricting him to light duty.  (*Id.* ¶ 36.)  Roe removed Burnett from the
12  Clanlab roster, initiated an inquiry to determine Burnett's medical status, and was informed
13  Burnett had been subsequently cleared for full duties.  (*Id.* ¶¶ 37-40.)  On January 22, 1997,
14  Roe informed Burnett he had been cleared for full duty and again scheduled him to
15  participate in Clanlabs.  (*Id.* ¶ 40.)  The next day, Burnett informed Roe the cancellation of
16  the light duty restriction was no longer accurate and that "personal knowledge of my physical
17  condition makes it prudent for me to avoid unpredictable and hazardous situations such as
18  Clandestine Laboratory operations.  Should you determine that my participation is necessary
19  before the supplementary results are completed, I would ask that you inform anyone I am
20  assign[ed] to accompany that a medical clearance is still pending."  (*Id.* ¶¶ 41-44.)  On
21  January 27, Roe informed Burnett he would not be required to participate in Clanlab
22  investigations or be assigned "bulk" (*i.e.*, heavy) exhibits until the medical issue was
23  resolved.  (*Id.* ¶ 46.)  Burnett was subsequently examined, and the doctor recommended
24  avoiding prolonged standing, heavy lifting or carrying, including lifting or carrying the safety
25  equipment used in Clanlab investigations.  (*Id.* ¶¶ 47-56.)  The DEA then accommodated
26  Burnett by "prohibiting him from assisting with clandestine laboratory activities [and] not
27  assign[ing] him bulk evidence exhibits for analysis," which Burnett considered reasonable.
28  (*Id.* ¶¶ 57-59.)

05cv0167

When Roe received Burnett's Clanlab training request later that year, he denied it "at this time," because "[t]he training is primarily to go over the use of safety equipment and since [Burnett] was not going on clan-lab assignments, he did not need the training." (*Id*. ¶ 60-63.)   The training included wearing the safety equipment which exceeded Burnett's weight limitations. (*Id*. ¶ 64.)   Although Burnett did not attend the training in 1997, he attended it in 1998 and the following years, after he explained that, in addition to fit testing the equipment, the re-certification class includes a discussion on clandestine lab sample analysis and new synthetic ways of making drugs. (*Id*. ¶ 65.)

Burnett also maintains he was discriminated against based on race and perceived mental disability when Roe did not assign him to sit in for him as a temporary supervisor in his absence.   Burnett was the sole African-American in a group of four forensic chemists under Roe's supervision.   Roe assigned the other three chemists to sit in, but not Burnett.   Roe selected the person to sit in for him "[b]ased upon their interest and how they related to the people in the group." (Pl.'s Ex. 4 at 4.)   He also noted that when Burnett came to his unit, Burnett warned him he was a paranoid person and a loner who did not mix with the group. (*Id*.)   Roe "respected that and tried to give him what he wanted with regard to being left alone." (*Id*.)   Burnett does not dispute he did not get along with the other three chemists. He stated he "would rather work alone than put up with the daily comments from Skinner, Oulton, or Malone, who seem to get along with each other." (Pl.'s Notice of Lodgment at 5.) In addition, Burnett admits he made a comment to Roe indicating he was paranoid. (*Id*.) The comment was made in connection with an incident involving Burnett and Skinner. (*Id*.)

## III.    PROCEDURAL HISTORY

In 1998, Burnett contacted the EEOC regarding his discrimination claims.   The thrust of Burnett's claim was that another forensic chemist in his group was promoted to GS-13, while Burnett was not promoted due to his race and disability.[2]   The EEOC investigated his claims, and held a hearing before an administrative law judge (ALJ), who found Burnett did not establish by a preponderance of the evidence that the DEA's conduct was based on his

---

[2] Burnett did not apply for a promotion. (Def.'s Ex. O at 7, 8, 9, 10.)

protected status.  (JSUF ¶ 70.)  Specifically, the ALJ found Burnett did not qualify for promotion to GS-13, and did not show he was a qualified individual with disability because he did not establish his back condition "substantially limited the major activity of lifting or any other major life activity." (Def.'s Ex. O at 6-11.)  Burnett appealed the decision to the EEOC Office of Federal Operations, where it was affirmed.

Burnett then filed his complaint in this action on January 25, 2005.  The parties filed cross-motions for summary judgment.  This Court, relying primarily on *Boyd v. U.S. Postal Serv.*, 752 F.2d 410 (9th Cir. 1985), denied Burnett's motion for summary judgment and granted the DEA's motion for summary judgment base on Burnett's failure to exhaust his administrative remedies.  In a brief opinion, the Ninth Circuit distinguished *Boyd* and remanded the case on February 25, 2008.  The panel found that because Defendant hadn't affirmatively set forth the statute of limitations as a defense in its answer, that defense was waived.  *See Burnett v. Mukasey*, 256 Fed. Appx. 940 (9th Cir. 2007). The panel's ruling is the law of the case, and prohibits the Court from permitting Defendant to amend his answer to include the statute of limitations defense.   *But see Owens v. Kaiser Foundation Health Plan, Inc.*, 244 F.3d 708, 713 (9th Cir. 2001) (citing *Wyshak v. City Nat'l Bank*, 607 F.2d 824, 826 (9th Cir. 1979) (holding that defendant could raise an affirmative defense such as *res judicata* or statute of limitations for the first time in a motion for judgment on the pleadings, where such defense would have been effective at the outset of the suit).

Following remand, the Court granted leave to file supplemental briefing and deferred ruling until conclusion of a settlement conference before a magistrate judge.  The parties tried, but failed, to reach a settlement.  Now pending are the original cross-motions for summary judgment set against the Ninth Circuit's decision to remand the case.

## IV.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(c) empowers the court to enter summary judgment on factually unsupported claims or defenses, and thereby "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 327 (1986).  Rule 56 allows a party to move for summary adjudication on any part of a claim or

1   defense.  *See* Fed. R. Civ. P. 56(a)-(d).  Summary judgment or adjudication is appropriate

2   if the "pleadings, depositions, answers to interrogatories, and admissions on file, together

3   with the affidavits, if any, show that there is no genuine issue as to any material fact and that

4   the moving party is entitled to judgment as a matter of law."  Fed. R.  Civ. P. 56(c); *see also*

5   *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir. 2001).

6       The moving party bears the initial burden of demonstrating the absence of a "genuine

7   issue of material fact for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

8   If the movant meets his burden, the burden shifts to the nonmovant to show that summary

9   adjudication is not appropriate.  *Celotex*, 477 U.S. at 317, 324.  The nonmoving party cannot

10  oppose a properly supported summary adjudication motion by "rest[ing] on mere allegations

11  or denials in his pleadings."  *Anderson*, 477 U.S. at 256.  The nonmovant must go beyond

12  the pleadings to designate specific facts showing that there are genuine factual issues that

13  "can be resolved only by a finder of fact because they may reasonably be resolved in favor

14  of either party."  *Id*. at 250.

15      In considering the motion, the nonmovant's evidence is to be believed and all

16  justifiable inferences are to be drawn in his favor.  *Id.* at 255.  Determinations regarding

17  credibility, the weighing of evidence, and the drawing of legitimate inferences are jury

18  functions, and are not appropriate for resolution by the court on a motion for summary

19  adjudication.  *Id*.

20  **V.    DISCUSSION**

21      *McDonnell Douglas Corp. v. Green* established a three-step burden shifting

22  framework to establish a federal discrimination claim by indirect evidence.  *McDonnell*

23  *Douglas Corp. v. Green*, 411 U.S. 792 (1973).[3]  Direct evidence of intentional discrimination

24  is rare, and the *McDonnell Douglas* test successively narrows the issues and "allows

25

26  [3] Burnett argues that the *McDonnell Douglas* framework is not applicable to his
    disability claim because he offered *direct* evidence of discrimination.  (Doc. No. 26 at 8-9.)
27  The direct evidence is that "Roe admitted that his motivation for denying Burnett the training
    opportunity was the fact that Burnett was not participating in clan lab activities."  (*Id*. at 9.)
28  This evidence does not establish that Roe was *biased* against Burnett because of Burnett's
    disability, but only that Roe believed the clan lab training should be given to employees
    participating in the clan lab activities.

1  discrimination to be inferred from facts that create a reasonable likelihood of bias and are

2  not satisfactorily explained." *Sandell v. Taylor-Listug, Inc.*, 188 Cal. App. 4th 297, 307 (Cal.

3  Ct. App. 2010) (citations removed).

4       Under the *McDonnell Douglas* framework, a plaintiff must first establish a prima facie

5  case of discrimination.  411 U.S. at 802.  "Making a prima facie showing of employment

6  discrimination is not an onerous burden." *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d

7  1080, 1091 (9th Cir. 2001).  If the plaintiff passes this threshold, the defendant bears "the

8  burden of production, but not persuasion" in showing the genesis of the decision was not

9  discriminatory. *Nicholson v. Hyannis Air Service, Inc.,* 580 F.3d 1116, 1126 (9th Cir. 2009).

10 Upon the offer by the defendant of a legitimate, non-discriminatory reason, the burden shifts

11 back to the plaintiff who must offer evidence sufficient to allow a reasonable jury to decide

12 the defendant's explanation is pretextual, although the amount of evidence to raise genuine

13 issue of fact is minimal to avoid summary judgment. *Id.* at 1126-27.  A "plaintiff can prove

14 pretext in two ways: (1) indirectly, by showing that the employer's proffered explanation is

15 'unworthy of credence'' because it is internally inconsistent or otherwise not believable, or

16 (2) directly, by showing that unlawful discrimination more likely motivated the employer."

17 *Chuang v. Univ. of Cal. Davis*,  225 F.3d 1115, 1127 (9th Cir. 2000).

18      **A.**     **The Rehabilitation Act Claim**

19      Enacted in 1973, the Rehabilitation Act protects "otherwise qualified individual[s] with

20 a disability" from "discrimination under any program or activity . . . conducted by any

21 Executive agency."  29 U.S.C. 794(a).  On October 29, 1992, Congress adopted the

22 Rehabilitation Act Amendments of 1992, announcing employer conduct shall be evaluated

23 for impermissible discrimination under the standards established in the American with

24 Disabilities Act (ADA).  Pub. L. No. 91-190, § 506, 1992 H.R. 5482 (1992) (codified at 29

25 U.S.C. 794(d)).

26      Under the Americans with Disabilities Act (ADA), an employer may not "discriminate

27 against a qualified individual on the basis of disability in regard to . . . job training, and other

28 terms, conditions and privileges of employment."  42 U.S.C. § 12112(a).  The ADA defines

as impermissible discrimination, in relevant part, as "denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant." 42 U.S.C. § 12112(a)(5)(B). An employer may defend against a charge of discrimination if an employee cannot meet a necessary and job-related qualification for the job or benefit even with reasonable accommodation by the employer. 42 U.S.C. § 12113(a).

The Rehabilitation Act, as affected by the ADA, simply says that if a disabled employee can perform all the essential tasks of a position, even if the employer has to make reasonable accommodations, the employer is barred from discriminating against that disabled employee. To establish a prima facie case under the Rehabilitation Act, Burnett must show: (1) he is disabled; (2) he meets the qualifications for Clanlab training (with reasonable accommodation, if necessary); and (3) he suffered an adverse employment decision based on impermissible discrimination. *See Snead*, 237 F.3d at 1087 (stating the elements of a disability discrimination claim).

The DEA first argues Burnett is not disabled, as defined by the ADA. (Doc. No. 22 at 17.) Specifically, the inability to lift over 20 pounds due to long-term recovery from back surgery[4] did not render Burnett disabled as a matter of law. The ADA defines disability as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. 12102(1). A "major life activity" includes "lifting" and "standing." 42 U.S.C. 12102(2). The Court should consider "the nature and severity of the impairment, the duration or expected duration of the impairment, and the permanent or long term impact . . . of the impairment." 29 C.F.R. 1630.2(j)(2).

Making all reasonable inferences in favor of Burnett, the evidence shows Burnett could not lift or carry anything over 10 pounds, could not carry the safety equipment required

---

[4] Burnett's back surgery was in June 1995. He became certified in clanlab training in November 1995. The clanlab re-certification training, which Roe prohibited Burnett from attending, was in October 1997.

1   for clanlab training, could not stand or sit for a long period of time and could not bend while

2   doing "light duty" at work.  (See JSUF ¶¶ 24, 49, & 54.)  The mere limitation on lifting or

3   standing is not always a disability.  For example, the Ninth Circuit held that a plaintiff's

4   inability to lift "more than 25 pounds on a continuous basis, more than 50 pounds twice a

5   day, and more than 100 pounds once a day" were not substantial limitations as a matter of

6   law.  *Thompson v. Holy Family Hosp.*, 121 F.3d 537, 539 (9th Cir. 1997).  Similarly, a District

7   Court in Washington held that a 15-pound lifting limitation while recovering from surgery was

8   not a substantial limitation on the plaintiff's ability to work.  *Williams v. Fred Meyer Stores,*

9   *Inc.*, 2008 WL 65507 (W.D. Wash. Jan. 4, 2008).  Here, Burnett has not pointed to sufficient

10  evidence to create a genuine issue of material fact on this issue.  But his claim fails for other

11  reasons as well.

12         The DEA next argues that Burnett is not a "qualified individual" under the ADA.  (Doc.

13  No. 22 at 20.)  The Court must consider the employer's judgment as to what functions of a

14  job are essential and any written descriptions of the job.  42 U.S.C. § 12111(8).  In this case,

15  a "Major Duty" of Burnett's job is to advice and assist "Special Agents in the performance of

16  certain enforcement actives such as clandestine laboratory seizures and vacuum sweeping

17  searches for controlled drugs and accompanying substances.  Such activities, however, are

18  of an irregular and intermittent nature."  (JSUF ¶ 17 (quoting the job description for a GS-12

19  Forensic Chemist).)  To participate in Clanlab seizures, chemists must be able to lift more

20  than 50 pounds and be able to access roof tops, basements, warehouses, and other areas

21  a drug smuggler may hide drugs.  (Id. at ¶ 18.)  The DEA argues that Burnett is not qualified

22  to be a GS-12 Forensic Chemist *if he is disabled* because he cannot lift more than 20

23  pounds, much less the 50 pounds required by the job.  That is, the Burnett can't have it both

24  ways: "Burnett was either not 'disabled,' or he was 'disabled,' but not a 'qualified individual.'"

25  (Doc. No. 22 at 22.)

26         The Court finds a reasonable jury could reject the DEA's argument and find that

27  Burnett is qualified to be a Forensic Chemist in light of the fact that Clanlab raids seem to

28  be a small part of a Forensic Chemist's duties.  Indeed, Burnett received high evaluations

1   while not participating in the Clanlab program, suggesting that with a proper accommodation,

2   a Forensic Chemist can do his or her job despite a temporary limitation on lifting abilities.

3       There is no genuine dispute about the potentially adverse employment decision

4   Burnett suffered.  The parties agree that Roe denied Burnett Clanlab training in October

5   1997.  The parties agree that Roe's rationale was because of the accommodations DEA had

6   made due to Burnett's lifting limitations.  The question is whether Roe's rationale is

7   discriminatory as a matter of law.  If Roe's rationale is not discriminatory, then Burnett cannot

8   show he suffered an adverse employment decision based on *impermissible discrimination*.[5]

9       In this case, the DEA accommodated Burnett's lifting limitations by "prohibiting him

10  from assisting in clandestine laboratory activities." (JSUF ¶ 58.) "Burnett considered this to

11  be a 'reasonable accommodation.'" (*Id*. ¶ 59.) If the DEA discriminated or retaliated against

12  Burnett because of that accommodation, there might be a cause of action, but the JSUF

13  shows the DEA did not.  Shortly after Burnett was relieved of Clanlab duties, his supervisor

14  rated him as "Fully Successful" in the portion of his performance evaluation that included

15  Clanlab duties.[6]  Moreover, the following month the same supervisor recommended Burnett

16  for a time-off award.  Burnett also received timely pay increases after implementation of the

17  accommodation.    Each decision suggests that Burnett suffered no retaliation or

18  discrimination, and there is no evidence to the contrary.

19      Instead Burnett argues that Roe's decision to deny him Clanlab re-certification training

20  was *itself* an adverse employment decision.  Burnett cites to *Allen v. Verizon Pennsylvania*

21  for the premise that an alleged discriminatory act—denying consumer advocate group

22  training to Allen—does not have to adversely affect the claimant's future employment.  *See*

23  *Allen v. Verizon Penn., Inc.*, 418 F. Supp. 2d 617 (M.D. Pa. 2005).  The Court agrees that

24  a denial of training may itself constitute discrimination, requiring no additional adverse

25  _____

26      [5] Because there is no alternative rationale, the Court cannot discuss the second or third parts of the *McDonnell Douglas* test.

27      [6] Burnett never argues, and the JSUF contains no evidence to suggest, that a rating
28  of "Fully Successful," which was lower than the marks he earned in three other categories, was less than Burnett would have received if he had participated in Clanlabs.  The fact is the "Fully Successful" marking implies Burnett was performing all *required* duties.

1  effects. The *Allen* case, however, is easily distinguishable because there was evidence that

2  the employer lowered the employee's ratings in retaliation to hearing accommodations the

3  employer made and—critically— that the training was denied because of the lowered ratings.

4  *Id.* at 620. The reason the employer denied Allen training was wholly unrelated to the

5  accommodations the employer made due to Allen's lose of hearing.

6        Here, Burnett does not suggest that his evaluation marks dropped because of his

7  disability or the accommodations DEA made. Rather, Burnett seems to argue that the DEA

8  "over-accommodated" him. Or, put differently, the accommodation itself was discriminatory.

9  To accommodate his lifting restrictions, The DEA reasonably excused Burnett from all

10  Clanlab activities, which must have included the certification training because the training

11  required participants to lift more than 20 pounds. (JSUF ¶ 19.) Roe denied Burnett's

12  request for Clanlab training because the *accommodation itself* prohibited participation in the

13  training. It was only later, after Burnett identified benefits of attendance beyond the training's

14  application to Clanlab participation, the request was approved. The agreed upon facts show

15  that the DEA made an accommodation based on Burnett's limitations, realized it went further

16  than necessary, and retracted the accommodation.

17        Burnett's argument flips the ADA on its head. Not only would an employer be

18  prohibited from discriminating against an employee because of the employer's frustration or

19  resentment from making accommodations, but also the employer could not follow the

20  accommodation without inviting a lawsuit. The ADA requires an employer to make

21  reasonable accommodations and the parties should be able to rely on those

22  accommodations moving forward. If courts were to adopt Burnett's understanding of the

23  ADA, employers would find themselves in an impossible dilemma whenever an employee

24  requested an accommodation. Clanlab training was specifically geared for duties directly

25  affected by the accommodation afforded the DEA. Burnett argues that Clanlab training

26  might have proved beneficial, but his argument or speculation is not evidence. No evidence

27  suggests that Clanlabs certification training served any other purpose than to prepare a

28  chemist for Clanlab operations. Even those benefits the Burnett pointed out to Laboratory

Director William Phillips as reasons to let him attend the training in 1998 were related to Clanlab sample testing, methodology and equipment.  The accommodation the DEA offered and the Burnett found acceptable eliminated Clanlab duties and the necessity to prepare for them.

Here, the DEA's actions were part of the interactive process the ADA requires both sides to undertake.  As the *Allen* court wrote, the "parties are required to engage in an interactive process to find a reasonable accommodation."  418 F. Supp.2d at 623 (citing *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 317 (3d Cir. 1999)).  The Ninth Circuit has held the "interactive process extends beyond the first attempt at accommodation," and obliges the employer to make changes when the first effort is unsuccessful or the employee seeks other accommodation.  *Humphrey v. Mem'l Hosp. Assoc.*, 239 F.3d 1128, 1138 (9th Cir. 2001).  By the undisputed facts in the case, the DEA made an accommodation eliminating Clanlabs as an essential task, Burnett accepted that accommodation, only later requesting training which had been excluded as part the accommodation.  When Burnett asked for the accommodation to be reconsidered, the DEA did so, changing it to allow Clanlab certification.  Burnett never suggests the DEA delayed, obstructed the process nor refused to communicate with Burnett.  Rather, the evidence indicates the DEA made an effort to "'meet with [Burnett]], request information about the condition and what limitations the employee ha[d], ask the employee what he or she specifically want[ed], show some sign of having considered the employee's request.'"  *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1115 (9th Cir. 2000) (quoting *Taylor*, 184 F.3d at 317) *vacated on other grounds by US Airways, Inc. v. Barnett*, 535 U.S. 391 (2002).  Burnett failed to meet the third element of his prima facie case.  There was no adverse employment decision but an ongoing interactive process, and thus, there was no violation of the ADA as a matter of law.

### B.    The Title VII Claim

The *McDonnell Douglas* burden-shifting test applies to Title VII claims.  To establish a prima facie case of discrimination under Title VII, the plaintiff must "show that (1) he belongs to a protected class; (2) he was qualified for the position, (3) he was subject to

adverse employment action, and (4) similarly situated individuals outside his protected class were treated more favorably." *Chuang*, 225 F.3d at 1123.  That Burnett is African-American or was qualified for the position is not in dispute.  (Doc. No. 22 at 23.)

Burnett claims he was subject to adverse employment action because he was denied an opportunity to "sit-in" for his supervisor while non-African-American co-workers who were otherwise similarly situated were permitted to do so.  (Doc. No. 26 at 12.)  The DEA disclaims (1) the opportunity to "sit-in" was an employment benefit, and thus, the denial of such an opportunity wasn't an adverse employment action, and (2) those who were permitted to sit-in were similarly situated because they either hoped to be managers one day or had more experience as a GS-12 than Burnett.  (Doc. No. 22 at 23.)  The evidence of discrimination here is painfully thin.  In a situation where all of a significant number of African-Americans in a larger mixed-race group are skipped for a choice assignment, the inference of discrimination might be clearer.  But here, only four people were involved, and the statistical argument lacks force.  Viewing the evidence in light most favorable to Burnett, it appears he has not established a prima facie case of discrimination under Title VII.  Out of an abundance of caution, however, the Court will continue with the remainder of the analysis.

The next step under *McDonnell Douglas* requires the DEA to articulate a legitimate non-discriminatory reason for the employment decision not to let Burnett sit-in for Roe.  The DEA submits that Roe did not let Burnett sit-in as supervisor because Burnett was a loner who didn't want to interact with the other workers assigned to Mr. Roe's team.  To support this claim, The DEA offers ample evidence in the form of Roe's and Burnett's own statements made during the processing of the Equal Employment Opportunity complaint.  (Ex. Q 18; Doc. No. 27, Ex. 7 at 4.)  The DEA carried its burden of production.

Burnett must now show the DEA's proffered reason was pretext.  He may do so either by attacking the credibility of the DEA's explanation or by persuading the court the DEA was more likely motivated by an discriminatory consideration.  *Nicholson*, 580 F.3d at 1126-27.  Burnett does neither.  His opposition is devoid of any evidence Roe lied.  Instead of

suggesting the stated reason is pretext, Burnett argues it was never uttered.  According to Burnett, "Roe, himself, has never said why he did not permit Plaintiff to 'sit-in'."(Doc. No. 55 at 4.)   This contention by Burnett is inexplicable given his replies to the DEA's interrogatories: (1) "The criteria Roe alleged he used to select Malone, Oulton and Skinner to 'sit-in' for him were their interest an how they related to the people in the group," and (2) "Among other things Roe refused to permit Plaintiff to 'sit-in' for him because he erroneously regarded Plaintiff as paranoid, a loner, and not interested in mixing with the group."  (Ex. Q at 16 & 18.)  Additionally, Burnett's own statement supports the DEA's valid, legitimate reason: Burnett stated his preference to work alone and conceded Roe "may feel he had treated me fairly."  (Pl.'s Not. Lodgment, Ex. 7 at 4.)  Even if Burnett was correct that Roe did not actually accomplish the goal of treating Burnett fairly, the issue at this juncture is Roe's reason, and Burnett acknowledges it may have been to treat him fairly, precisely the laymen's definition of "non-discriminatory."   To disbelieve this explanation, a jury would therefore have to reject not only the DEA's explanation, but Burnett's own admissions.

Moreover, other relevant stipulated facts support the DEA's contention Burnett was not the subject of racial discrimination.  Burnett denies ever hearing racial epithets in the work place, Burnett never told anyone he thought Mr. Roe was a bigot, and Burnett continued to receive high marks, pay raises and promotions under Mr. Roe.  These are the type of collateral facts courts perceive as indicators of the existence or non-existence of discrimination.  For example, in *Nicholson*, the Ninth Circuit found the female plaintiff had offered evidence in making her prima facie case that (1) showed the employer treated male employees with similar performance shortcomings differently, and (2) certain statements suggested a disparate approach to her as a woman.  580 F.3d at 1128.

In an eleventh hour effort, Burnett submitted the affidavit of Joanne Katz.  (Doc. No. 66.)  Burnett points to paragraphs 13 and 14 as particularly relevant.  (*Id.* at 1.)  The Court does not agree.  Katz begins on point: "I worked for . . . Claude Roe, . . . and I know Mr. Roe was racially prejudiced towards African-Americans," but she never tells us how she knows this or how she formed this opinion.  (*Id.* at 4.)  Nowhere in the rest of her affidavit does she

05cv0167

ever mention Roe again.  She does offer as an example, "management's" inequitable application of performance standards, but because the undisputed facts show Roe continued to rate Burnett's performance as excellent for the period in question, "management" cannot mean Roe.  Thus, Katz's affidavit on this point fails to reflect "personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(e)(1).

Katz's affidavit also never addresses what is required at this point under the *McDonnell Douglas* test: was Roe's stated non-discriminatory reason for not assigning Burnett temporary supervisor duties merely pretext?  Perhaps facts indicating other discriminatory actions on the part of Roe might indicate discrimination was more likely the reason behind his employment decision, but since Katz  never points to any, her affidavit is wholly irrelevant to this inquiry.

On page 5 of her affidavit, Katz does suggest the DEA retaliated against Burnett for "EEO activity," which would be pertinent to this claim.  Once again, however, after stating the opinion that "everyone who files a grievance here is held at arm's length by managers," Katz omits any factual basis for this conclusion and proceeds to discuss a "recent realignment of groups"[7] that even she believes was based on Burnett's race rather than evidence of retaliation.  Katz's claim of "arm's length" treatment by management also fails to meet the standards of Rule 56(e)(1), and is precisely the kind of testimony that does "not rise above 'subjective belief or unsupported speculation'" upon which opposition to summary judgments fail.  *See General Elec. Co. v. Joiner,*  522 U.S. 136, 140-41 (1997) (upholding a grant of summary judgment) (quoting *Joiner v. General Elec. Co.,* 864 F. Supp. 1310, 1326 (N.D. Ga.1994)).  Rule 56(e)(1) permits this Court to let the parties supplement affidavits with depositions, interrogatories, or additional affidavits, but the Court finds no justification for this additional delay and expense.  Beyond the fact Katz doesn't offer evidence Burnett suffered retaliation, Burnett himself never makes that claim.  Even though he filed his original complaint more than six years after he first registered a grievance with the EEOC and nearly

---

[7] The affidavit was made well after the relevant time period.

1  two years after the EEOC administrative judge issued a ruling against him, Burnett never

2  alleged the DEA retaliated against him; not even in his post-appeal supplemental brief filed

3  almost ten years after this dispute began.

4        Additionally, there is no reason to explore Katz's suggestion Burnett was recently

5  transferred to a new group based on his race because, even if true, it is an entirely new

6  incident rather than evidence of an ongoing program of discrimination.  Roe has been retired

7  for more than ten years; Phillips is no longer the laboratory director.  (Katz Aff. 3.)  If the new

8  "management" has perpetrated an unrelated act of discrimination, Burnett is obligated to

9  pursue that claim through the EEOC first.  *See Green v. L.A. County  Superintendent of*

10  *Schools*,  883 F.2d 1472, 1475 (9th Cir. 1989) (finding unrelated claims not part of the

11  original complaint).

12       Although little evidence is required to raise the specter of pretext, *Nicholson*, 580

13  F.3d at 1127, the Burnett offered none and thereby fails the third stage of the *McDonnell*

14  *Douglas* test.  Thus, summary judgment on the Title VII claim in favor of the DEA is

15  appropriate.

16        Burnett also tries to recast this as an ADA claim by arguing his status as a "loner"

17  qualified him as disabled, but the argument also fails as a matter of law.  Employers'

18  obligations to engage in the interactive process of accommodating disabled employees are

19  not triggered until the employee notifies the employer of the disability and requests an

20  accommodation.  *Barnett*, 228 F.3d at 1114.  In cases in which the employee is incapable

21  of making such a request and the employer is aware of the circumstances, the employer

22  must initiate the process.  *Barnett*, 228 F.3d at 1114.  If Burnett felt he was disabled because

23  of his predilection for working alone, he was capable of making a request for

24  accommodation.  Even if Burnett informed Roe of his "loner" status, he did not claim it was

25  a disability, nor did he request an accommodation.  In the loosest terms, Roe's willingness

26  to give Burnett the solitude he asked for might be considered an unsolicited accommodation,

27  but then the same paradigm of "over-accommodating" attaches, in that Roe excused Burnett

28  from  interacting  with  others,  including  as  temporary  supervisor.   If  "unsolicited

1  accommodation" interpretation of events is accurate, then it is also true Burnett waited

2  approximately ten years to engage in the interactive process and request a modification to

3  that accommodation.  Such a delay doesn't impute bad faith to Roe, even if this Court were

4  inclined to accept Burnett noticed the DEA of his "loner disability" and requested an

5  accommodation.

6  **VI.    CONCLUSION**

7         For the reasons set forth above, Burnett's Motion for Partial Summary Judgment is

8  **DENIED**, and the DEA's Motion for Summary Judgment on All Claims is **GRANTED**.

9

         **IT IS SO ORDERED**.

10 DATED:  December 23, 2010

11

12                                    **HONORABLE LARRY ALAN BURNS**
                                      United States District Judge
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

05cv0167